IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 18-110-BLG-SPW-TJC |
| Plaintiff, | |
| vs. | **FINDINGS AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| JERMAINE DAVID RICHARDSON, | |
| Defendant. | |

Defendant Jermaine David Richardson ("Richardson") is charged with being a felon in possession of a firearm.  (Doc. 1.)  He has moved to suppress evidence under the Fourth Amendment.  (Doc. 24.)

On October 31, 2018, U.S. District Judge Susan P. Watters referred Richardson's motion to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B) and Rule 59(a), Fed. R. Crim. P., for the purpose of conducting a hearing and issuing appropriate findings and recommendations.  (Doc. 28.)

Richardson asserts that evidence of a firearm obtained from a search of his residence should be suppressed.  He contends the firearm was first observed by law enforcement during a warrantless search of his residence, and there were no exceptions to the Fourth Amendment warrant requirement which authorized the search.

1

The Court held an evidentiary hearing on November 21, 2018, and the parties presented evidence on the motion.  Having considered the parties' arguments and submissions, the Court **RECOMMENDS** that Richardson's Motion to Suppress be **GRANTED.**

## I.    BACKGROUND

The Court heard testimony from Billings Police Department Sergeant Riley Finnegan ("Sergeant Finnegan") and Detective Steven Hallam ("Detective Hallam").  The following facts are taken from the hearing testimony and the parties' briefs.

On June 21, 2018, Richardson was living in a trailer home in Billings, Montana.  On that date, Billings Police Officer Kramer observed a suspected stolen vehicle outside of Richardson's residence.  (Doc. 25 at 2, Doc. 35 at 2.)  Officer Kramer ran the vehicle's license plates, and learned the vehicle was associated with a female juvenile who was reported missing.  (Doc. 35 at 2.)  Officer Kramer reported the stolen vehicle, and Sergeant Finnegan and Detective Hallam responded to the residence.  (Tr. 6.)  The officers knew Richardson lived in the trailer, and that he was currently being investigated by the Billings Police Department's Street Crimes Unit for possible narcotics and prostitution-related offenses.  (Tr. 7, 27.)

Officer Kramer, Sergeant Finnegan, and Detective Hallam discussed the situation and decided to contact the occupants.  (Tr. 10.)  Officer Kramer and Sergeant Finnegan approached the front door of the trailer, while Detective Hallam positioned himself to watch the back door.  (Tr. 10-11, 45.)  Sergeant Finnegan testified that neither he nor Officer Kramer had their weapon's drawn; Detective Hallam also testified he did not have his gun drawn.  (Tr. 25, 65.)

After Officer Kramer knocked on the front door, Richardson opened the door and Sergeant Finnegan smelled the odor of marijuana coming from inside the trailer.  (Tr. 10.)  Detective Hallam also testified that he smelled marijuana permeating from the back of the trailer.  (Tr. 46.)  Sergeant Finnegan did not see anyone else in the trailer at that time, but Richardson confirmed the missing female juvenile was inside and was going to come out.  (Tr. 10-11.)

During Richardson's exchange with Sergeant Finnegan and Officer Kramer, Detective Hallam observed two males exit the back of the residence.  (Tr. 46.)   He noticed one of the individuals had a backpack.  Detective Hallam yelled "stop, police," but both individuals ran.  *Id.*  Detective Hallam chased the two individuals, eventually catching one of them.  (Tr. 47.)  Detective Hallam detained the individual, and walked him back to the trailer.  (Tr. 47.)

After turning the individual over to other officers, Detective Hallam retraced the route he took to chase the two individuals, looking for anything that was

dropped or discarded.  *Id.*  He found a backpack in a garbage can along the route, matching the backpack he saw in the possession of one of the fleeing individuals. (Tr. 48.)   Detective Hallam testified the backpack was three-quarters unzipped, and he observed a medium-sized Mason jar containing a green leafy substance consistent with marijuana in plain view.  *Id.*  He confiscated the backpack and returned to the trailer.  (Tr. 49.)

In the meantime, the juvenile female had exited the trailer, and Richardson had closed the door to the trailer.  (Tr. 12.)  Three additional officers also arrived on the scene.  (Tr. 12.)  The officers then gathered approximately ten to fifteen feet outside the front of the residence to discuss their next course of action.  (Tr. 28, 68.)  The discussion lasted approximately five minutes.  (Tr. 28.)  Sergeant Finnegan ultimately decided to again contact the occupants to secure the residence pending a search warrant application.  (Tr. 13.)  He testified the decision was made to: (1) ensure the residence was a safe and secure scene; and (2) "prevent the destruction of any evidence that possibly could be located inside of the trailer." (Tr. 14.)

Detective Hallam estimated it took ten minutes from the time the individuals fled to the time the officers knocked on the door again; Officer Finnegan estimated it took fifteen minutes.  (Tr. 29, 68.)  Both officers testified that none of the officers had their weapons drawn throughout that period.  (Tr. 29, 69.)

4

When they returned to the front door, Detective Hallam testified the officers knocked multiple times, and "it took more time than it should have taken for somebody to come to the door, figuring [the officers] just had contact with them not so long ago."  (Tr. 53.)  After responding, the occupants were instructed to exit the residence, and the officer's handcuffed them as they did so.  (Tr. 15.) Detective Hallam testified that when he grabbed one of the individual's hands to place the handcuffs, "his forearms and hands were very, very cold and wet," which to him "was a clue that something nefarious was absolutely taking place."  (Tr. 53.) His cold, wet hands caused Detective Hallam to have a "gut feeling or gut suspicion . . . when we knocked and they didn't answer the door right away the second time he was probably in there destroying evidence."  (Tr. 58.)

Four individuals, including Richardson, voluntarily exited the trailer.  (Tr. 16.)  Together with the two individuals who had fled, and the juvenile who had come out earlier, a total of seven individuals had exited the trailer.  (Tr. 16.) Sergeant Finnegan testified that the occupants were cooperative throughout this process.  (Tr. 31.)  Detective Hallam testified that none of the officers had their guns drawn.  (Tr. 70.)

The six occupants who remained on the scene were placed next to the patrol vehicles.  (Tr. 34.)  Sergeant Finnegan did not recall if he, or any of the other officers, asked any of the occupants whether anyone else was still inside the

5

residence.  (Tr. 32.)  Detective Hallam also did not recall whether the question was asked.[1]  He indicated in his testimony, however, that "everybody [who] had come outside had told us nobody else was in that trailer."  (Tr. 53-54.)

After removing Richardson and the other occupants, the officers did not have any knowledge that others were still in the residence.  Sergeant Finnegan testified that "it wasn't known for certain" whether anyone remained inside.  (Tr. 33.)  But he acknowledged that he did not have any information to suggest that there were more people remaining inside.  (Tr. 39.)  Detective Hallam also testified there was no way of knowing whether there was anyone still in the trailer.  (Tr. 73.)

Nevertheless, Officer Kramer, Sergeant Finnegan, and Detective Hallam entered the residence to perform what they considered to be a "protective sweep." (Tr. 17, 34.)  Sergeant Finnegan testified the officers were not looking for anybody in particular inside the residence.  (Tr. 35.)  Detective Hallam testified that because some of the individuals had not obeyed their commands, it was necessary to perform a protective sweep "to ensure nobody else was hiding in the residence . . .

---

[1] Detective Hallam initially testified, "protocol would be to ask the individuals if there's anyone else in there.  I can't recall if I specifically asked them.  But normally, yes, that's what I would do."  (Tr. 73.)  After reviewing his report, however, he stated, "It doesn't look like I asked that question."  (Tr. 74-75.)

lying in wait for potential officers to reenter the house . . . and/or they may be destroying items of evidentiary value."  (Tr. 54.)

Sergeant Finnegan and Detective Hallam testified the protective sweep lasted only a minute or two.  (Tr. 18, 55.)  During the sweep Detective Hallam observed a semi-automatic black handgun on the top shelf of a closet inside one of the bedrooms.  (Tr. 55.)  He did not seize the handgun; he finished the sweep, and exited the house.  (Tr. 55, 57.)

The officers then called the legal guardians of the juveniles in the group of detainees, secured the exterior of the residence, and waited for Officer Kramer to apply for and obtain a search warrant.  (Tr. 57.)  All of the occupants were released from the scene without arrest.  (Tr. 19.)

After obtaining a warrant to search the residence, the firearm seen by Detective Hallam during the prior entry was seized.  Richardson was subsequently charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## II.   **DISCUSSION**

The United States Supreme Court has "firmly established the 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'"  *Groh v. Ramirez*, 540 U.S. 551, 559 (2004) (quoting *Payton v. New York*, 445 U.S. 573, 586 (1980).

Therefore, in the absence of a recognized exception to the warrant requirement, "a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." *Id.*

The government argues that two exceptions to the warrant requirement apply here. The government contends that exigent circumstances justified the warrantless entry because it was necessary to prevent the destruction of evidence. In addition, the government maintains that the entry was permitted as a protective sweep conducted for officer safety. Richardson argues that neither exception applies in this case.

## A.    Exigent Circumstances - Destruction of Evidence

Exigent circumstances are defined as "those that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. Furrow*, 229 F.3d 805, 812 (9th Cir. 2000) (quoting *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984.)

The government has a heavy burden of demonstrating that exigent circumstances justified a warrantless search. *Welsh v. Wisconsin*, 466 U.S. 740 (1984). It can only meet its burden by pointing to specific and articulable facts

indicating exigency. *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000). An officer's mere suspicion or hunch is inadequate. *United States v. Starnes*, 741 F.3d 804, 808 (7th Cir. 2013.) A court determines whether an exigency existed by considering the totality of circumstances from the viewpoint of the officers at the time of the warrantless entry. *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987).

In this case, the government points to the destruction of evidence as the exigency which permitted the warrantless entry. But the Court finds the government has not sustained its "heavy burden" to show with specific and articulable facts that the entry was required for that purpose.

To show that the entry was necessary to prevent the destruction of evidence, the government would have to demonstrate that the officers had a reasonable belief that someone was inside the trailer who could accomplish the destruction. In fact, several circuits have specifically required such a showing. *See e.g.*, *United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990) (warrantless entry to prevent destruction of evidence is justified if government demonstrates reasonable belief that third parties are inside dwelling); *United States v. Schaper*, 903 F.2d 891, 894 (2d Cir. 1990) (warrantless entry justified where agents have a reasonable belief that there are persons inside residence who might destroy evidence); *United States v. Napue*, 834 F.2d 1311, 1327 (7th Cir. 1987) (officers must have a reasonable

belief that there are people within the premises who are destroying or are about to destroy evidence); *United States v. Anderson*, 981 F.2d 1560, 1567 (10th Cir. 1992) (evidence insufficient to establish reasonable belief that someone was still inside residence).

While the Ninth Circuit has not expressly stated this as a requirement, it has declined to find exigent circumstances based on the potential destruction of evidence where the presence of a third party has not been shown. *United States v. Suarez*, 902 F.2d 1466, 1468 (9th Cir. 1990) (government failed to present "sufficient evidence to indicate that the agents had a reasonable belief that [the defendant] had any codefendants in his apartment who could destroy evidence"); *U.S. v. Furrow*, 229 F.3d 805, 813 (9th Cir. 2000) (overruled on other grounds, *U.S. v. Johnson,* 256 F.3d 895 (9th Cir. 2001) (government failed to demonstrate officer had "specific and articulable" facts that led him to infer that any suspects remained in the house). *See also United States v. Rodriguez*, 869 F.2d 479, 485 (9th Cir. 1989) (finding the existence of exigent circumstances highly questionable where there was no evidence officers attempted to determine whether the house was occupied prior to entry); and *United States v. Lundin*, 47 F.Supp.3d 1003, 1019 (N.D. Cal. 2014) ("any fear of destruction of evidence was contingent upon the likelihood that another person was inside to perform the destruction").

In this case, the government cannot articulate any facts to establish that the officers reasonably believed that the trailer was occupied by anyone after removing Richardson and the other occupants.  The officers were aware that Richardson resided in the trailer, but they had no knowledge that anyone else lived there with him.  (Tr. 35.)  Richardson came outside the trailer when directed to do so, along with several other individuals.  (Tr. 15-16.)  In all, seven individuals had vacated the trailer.  (Tr. 16).  At that point, the officers had no knowledge that anyone else remained in the trailer.  They did not see anyone inside the trailer; they did not hear anyone inside; and they can point to no evidence suggesting that anyone was not accounted for.  Sergeant Finnegan candidly acknowledged that the officers did not have any information to suggest there were more people inside Richardson's home.  (Tr. 39.)  Detective Hallam similarly acknowledged that he had "no way of knowing either way" whether anyone remained in the trailer.  (Tr. 73.)

To support the search, however, the government points to several factors, including evidence that the officers had probable cause to believe the occupants were involved in criminal activity; they could smell the odor of marijuana coming from the trailer; two individuals fled out of the back door; a backpack containing marijuana was recovered near the trailer; and Richardson had been involved in ongoing investigations.  (Doc. 35 at 10-11.)  The government concludes that these factors provided "at the very least reasonable suspicion to believe there may be

11

another person still in the trailer." (Doc. 35 at 11.)  The Court disagrees.  None of

these factors lend any support to the conclusion that other individuals remained in

the trailer who could destroy evidence.  The factors may bolster a finding of

probable cause that the trailer contained marijuana. [2]  But probable cause is not

enough.  "The Fourth Amendment prohibits police officers from making a

warrantless entry into a person's home, unless the officers have probable cause *and*

are presented with exigent circumstances." *LaLonde*, 204 F.3d at 954 (9th Cir.

2000) (emphasis in original).

It also appears the officers had reason to believe that the occupants had

attempted to hide or destroy evidence prior to their entry.  Detective Hallam

---

[2] The nature of the offense in this case also weighs against finding exigent
circumstances.  Several courts have found that suspicion of marijuana possession is
not sufficiently serious to justify a warrantless entry into a home. *See United
States v. Race,* 2015 WL 576171 *19 (W.D.N.Y Feb. 11, 2015) (collecting cases);
*see also, State v. Olson*, 589 P.2d 663, 665 (Mont. 1979) (smell of marijuana
smoke "alone is not sufficient to justify the invasion of the privacy of one's home"
under Montana law).  The Ninth Circuit has not found that probable cause for
possession of marijuana is insufficient to justify a warrantless entry based on
exigent circumstances.  In *United States v. Reid*, however, the court refused to find
the destruction of evidence exigency permitted warrantless entry when all the
government could point to was 1) the smell of marijuana burning inside the
residence; and 2) a vehicle parked in the residence's assigned parking space.  226
F.3d 1020, 1028 (9th Cir. 2000).  One year later, the Ninth Circuit considered the
gravity of the underlying offense as a factor in determining exigency. *United
States v. Johnson*, 256 F.3d 895, 908 (9th Cir. 2001).  There, the court found a
misdemeanor offense "does not definitely preclude a finding of exigent
circumstances, [but] it weighs heavily against it." *Id*.

recovered a backpack containing marijuana from a trash can.  He reasonably believed the backpack was disposed of by one of the individuals who fled from the trailer.  Detective Hallam also testified that one of the occupants of the trailer had cold, wet hands at the time he came out of the trailer.  He believed this was consistent with someone trying to dispose of contraband down a toilet or sink.  (Tr. 54.)  But those events had already occurred.  The chase was over and the backpack was recovered.  The occupant with the cold, wet hands had been removed from the trailer and was in handcuffs.  At the time of the entry, there was nothing to indicate that the destruction of evidence was ongoing, or would occur prior to the time the officers could secure a warrant.

In their testimony, the officers also pointed out that they could not exclude the possibility that another individual remained.  (Tr. 17, 73.)  But law enforcement can seldom rule out the possibility that others are present; that is not the relevant standard.  If it were, the Fourth Amendment's warrant requirement would be effectively eliminated anytime officers have probable cause to believe that disposable contraband is in a residence.  The officers need to have both probable cause and the reasonable belief that entry is necessary to prevent the destruction of evidence.

/ / /

/ / /

13

### B.      Protective Sweep

The government also contends the entry was justified as a protective sweep.
The Supreme Court has defined a protective sweep as a "quick and limited search
of premises, incident to an arrest and conducted to protect the safety of police
officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The safety risk to
officers or other persons is the exigent circumstance that permits a protective
sweep. *Furrow*, 229 F.3d at 811-12.  In *Buie*, the Court held that, as an incident to
arrest, officers do not need probable cause or even reasonable suspicion to look in
spaces immediately adjoining the place of arrest.  494 U.S. at 335.  "Beyond that,
however, [the Court held] there must be articulable facts which, taken together
with the rational inferences from those facts, would warrant a reasonably prudent
officer in believing that the area to swept harbors an individual posing a danger to
those on the arrest scene." *Id.*

The Ninth Circuit has determined that a protective sweep can be conducted
when an arrest occurs outside of a structure.  *United States v. Paopao*, 469 F.3d
760, 765-66 (9th Cir. 2006).  In those circumstances, however, the Court has
required that the government present articulable facts supporting the reasonable
belief that other persons were present inside who posed a danger to the officers.
*See*, *Paopao*, 469 F.3d at 766 (citing *Buie*, and requiring articulable facts
supporting the belief that area to be swept harbors an individual posing danger);

14

*United States v. Hoyos*, 892 F.2d 1387 (9th Cir. 1989) overruled on other grounds by *United States v. Ruiz*, 257 F.3d 1030, 1032 (9th Cir. 2001) (*en banc*) ("'[a]rresting officers have a right to conduct a quick and cursory check of the arrestee's lodging immediately subsequent to arrest—even if the arrest is near the door but outside the lodging—where they have reasonable grounds to believe that there are other persons present inside who might present a security risk.'") (quoting with approval from *United States v. Jackson*, 700 F.2d 181, 189 (5th Cir. 1983)).

Here, the Court finds the protective sweep exception does not justify the officers' entry into the trailer.  First, there is a substantial question whether the exception applies outside of an actual arrest.  *Buie* only recognized the application of a protective sweep to searches that are "incident to arrest."  *Buie*, 494 U.S. at 327.  Nevertheless, several circuit courts have extended the rationale in *Buie* to other situations where officers are lawfully in a residence for reasons other than arrest.  *See e.g. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013) (protective sweep's purpose does not change depending on how the officers arrived – officers face danger simply by standing on the home-turf of a criminal suspect).

But other circuits, including the Ninth Circuit, have taken a more narrow view of the application of the exception.  Initially, it appeared the Ninth Circuit would adopt the more expansive application of the exception.  In *United States v. Garcia*, the Court found that officers reasonably conducted a protective sweep

15

after receiving consent to enter the residence.  997 F.2d 1273, 1282 (9th Cir. 1993).
Since then, however, the Court has declined to apply the protective sweep
exception where the suspect was only detained and not under arrest.  *Reid*, 226
F.3d at 1027 (9th Cir. 2000) (citing *United States v. Noushfar*, 78 F.3d 1442 (9th
Cir. 1996).

In this case, while the individuals inside Richardson's trailer were detained,
none were arrested.  The officers ran a warrant check of the trailer's occupants, and
all were then released without arrest.  (Tr. 19.)  Therefore, under the application of
the exception in *Reid*, entry into Richardson's home could not be authorized as a
protective search.

More fundamentally, however, the search cannot be validated under the
protective sweep exception because it did not meet the fundamental purpose of the
rule – "to protect officers from attack by dangerous confederates." *United States.
v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008).  Applying *Buie*, the Ninth Circuit
has established that "[a] protective sweep must be supported by specific and
articulable facts supporting the belief that other dangerous persons may be in the
building or elsewhere on the premises." *Id.* (internal citations and quotations
omitted).  Here, the government has not established that the officers either feared
for their safety, or that they had a reasonable belief that anyone was still in the
trailer when they entered the residence.

Any argument that the officers feared for their safety is belied by their conduct at the scene.  The officers did not draw their weapons when they approached the trailer, nor did they do so when they later removed the occupants of the trailer.  In addition, after regrouping at the trailer prior to entry, the officers stood approximately ten-fifteen feet outside the trailer for approximately five minutes and discussed their next course of action.  At no time did any of the officers have their weapons drawn or otherwise indicate they were concerned for their safety.  Sergeant Finnegan acknowledged this, testifying that other than the flight of the two individuals out of the back of the trailer, there were no indications that there were any safety risks that day.  (Tr. 37.)

In this regard, this case is similar in many respects to *Furrow,* 229 F.3d 805 (9th Cir. 2000).  There, officers responded to an ongoing teenage party in a cabin. When they arrived, several juveniles fled from a bonfire located several yards from the cabin.  The officers then looked in a window and observed six to eight juveniles inside the cabin drinking beer.  When the officers knocked on the door, the juveniles fled to the second floor of the cabin.  Ultimately, however, the juveniles voluntarily came out of cabin.  They were lined up and their identifications were checked.  One or two were found in possession of marijuana or marijuana pipes, and they were handcuffed and placed in the back of a patrol vehicle.  One of the officers then contacted the county's prosecuting attorney to

17

request a search warrant.  The attorney told them they had insufficient information

for a warrant, but advised the officers to perform a protective sweep instead.  The

officers did so, and observed additional evidence of marijuana and drug

paraphernalia.

The Ninth Circuit held that the warrantless entry could not be justified as a

protective search.  The Court recognized that the Supreme Court in *Buie*

"emphasized the precautionary nature of the search, the seriousness of the crime

involved, and the need for law enforcement to protect themselves by securing the

scene and preventing surprise attacks by co-conspirators."  *Id.* at 812.  The Court

found the search in *Furrow* was not conducted under the circumstances

contemplated by *Buie*.  The Court stated there was no evidence the officers had any

concern for their safety or the safety of others.  *Id.* at 812.  The Court pointed out

that the "'protective sweep' took place *after* the teenagers had all been rounded up,

carded, and arrested, and *after* [the officer] had placed the telephone call [to the

prosecuting attorney]."  *Id.*  The Court found "[i]t is not reasonable to think the

officer would have placed a call to [the prosecuting attorney] before entering the

cabin if he thought a potentially dangerous suspect was still holed up inside."  *Id.*

While the sequence of events is not identical to this case, it is not reasonable

in the present situation to think that the officers would have had a five-minute

conference to contemplate their next move within ten to fifteen feet of the trailer if

18

they had any concern for their safety.  It is also unlikely they would have stood at the threshold of the residence while the occupants exited without any officers having their weapons drawn.

In addition, the government cannot show specific and articulable facts that others remained in the trailer.  As discussed above, the government cannot articulate any facts to establish that the officers reasonably believed that the trailer was occupied by anyone, much less that it "harbored an individual posing a danger to those on the arrest scene," as contemplated in *Buie*.

### C.    Independent Source Rule

"The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search," as well as derivative evidence "that is the product of the primary evidence, or is otherwise acquired as an indirect result of the unlawful search." *Murray v. U.S.*, 487 U.S. 533, 536-37 (1988) (citations omitted).  Evidence subject to the exclusionary rule may nevertheless be admissible if it was also obtained through an "independent source." *Id.* at 537-538.

In situations where a lawful search pursuant to a warrant is preceded by an unlawful warrantless search, it must be established that the former is "a genuinely independent source of the information and tangible evidence" to be used. *Id.* at 542.  Thus, for the independent source rule to apply in the circumstances presented here, it must be determined (1) whether the "agents' decision to seek the warrant

19

was prompted by what they had seen during the initial entry," and (2) whether evidence seen or information obtained during the initial entry "was presented to the Magistrate and affected his decision to issue the warrant." *Id.* at 542.  It is the function of the district court to make these factual findings.  *Id.* at 543; *see also United States v. Heselius*, 671 Fed.Appx. 518, 519 (9th Cir. 2016) (government conceded remand was necessary for factual findings regarding the second prong of this analysis).

In its response to Richardson's motion, the government did not argued that evidence of the gun is admissible because it was obtained through an independent source.  Testimony at the hearing indicated that the officers may have decided to seek a warrant prior to the initial warrantless entry, and thus the government may be able to satisfy the first prong of the independent source analysis.  But the government has not submitted any evidence to satisfy the second prong; it has not shown whether the information or evidence acquired in the initial entry was presented to the magistrate and affected his or her decision to issue the warrant. Therefore, the Court is unable to make any findings on this issue, and cannot conclude that the independent source rule would save evidence of the gun from the exclusionary rule.

/ / /

/ / /

III.   **CONCLUSION**

For the reasons stated above, **IT IS HEREBY RECOMMENDED** that Richardson's Motion to Suppress (Doc. 24) be **GRANTED.**

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 26th day of December, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge